No. 53,714

THE GARNETT STATE SAVINGS BANK, A Kansas Banking Corporation, *Appellant*, v. GEORGE M. TUSH, JR., JACQUELYN TUSH, a/k/a JACKY TUSH, and RONALD TUSH, *Appellees.*

(657 P.2d 508)

448

Opinion filed January 14, 1983.

*Terry Jay Solander,* of Loughridge & Solander, of Garnett, argued the cause and was on the brief for appellant.

*Richard L. Hines,* of Hines, Wood & Ahlquist, of Erie, argued the cause and was on the brief for appellee George M. Tush, Jr.

*Orville J. Cole,* of Cole & Doering, of Garnett, argued the cause and was on the brief for appellee Jacquelyn Tush.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by the plaintiff Garnett State Savings Bank, Garnett, Kansas, (Bank), in an action filed against George M. Tush, Jr., and his wife, Jacquelyn Tush (Tushes), to recover money due under a series of notes executed by the Tushes and to foreclose their interest under a contract of sale of real estate. Following trial to the court, judgment was entered for the defendants. The Bank has appealed and, pursuant to K.S.A. 20-3018(c), the case was transferred from the Court of Appeals. We reverse.

The Tushes had been customers of the Bank for several years

and had established a line of credit with the Bank to finance their farming operation. From time to time the Tushes would call upon the Bank for additional funds and over a period of several years numerous notes, renewal notes and security agreements were executed by them to the Bank. The notes involved in this action were (1) a promissory note and a security agreement dated January 21, 1974, in a principal amount of $6,300.00; (2) a note and security agreement dated December 5, 1977, in a principal amount of $5,500.00; (3) a note and security agreement dated December 29, 1977, in a principal amount of $20,536.80; (4) a note dated June 21, 1978, in a principal amount of $1,750.00; and (5) a combination collateral note dated December 1, 1978, in a principal amount of $2,500.00.

A representative of the Bank testified that following the wheat harvest of 1977, he talked with the Tushes about their indebtedness to the Bank and advised them additional security would be required for any additional extension of credit. He testified the Tushes agreed that if additional credit was required in the future they would use their equity in a quarter section of land they were purchasing as additional collateral for the Bank. At that time the Tushes were occupying as their homestead the Northwest quarter of Section 15, Township 22 South, Range 19 East of the Sixth Principal Meridian, Anderson County, Kansas, which they were purchasing under a real estate sales contract wherein Clyde D. Durst and his wife, Holly C. Durst, were the sellers. The Durst contract was entered into in October of 1975 and the combination of payments by the Tushes and the effects of inflation resulted in the Tushes having a substantial equity in the real estate.

In December, 1977, when the Tushes needed to refinance some of their existing indebtedness, they executed the December 5, 1977, note and security agreement. That agreement provided, in part:

"The undersigned and each of the undersigned grant to The Garnett State Savings Bank, Garnett, Kansas, 66032 ('Bank') a security interest in the following property . . . (herein called 'Collateral'): the assignment of equity interest in a contract of sale for purchase of a farm wherein the above-named George M. Tush, Jr. and Jacky Tush, are buyers, and Clyde and Holly Durst are sellers, said contract of sale being dated 10-1-75, with the total purchase price being $70,000.00 and the present unpaid balance being $58,500.00, together with all rights relating thereto."

The agreement also provided:

"The security interest granted to the Bank hereunder shall secure all obligations of the undersigned to the Bank, howsoever created, evidenced or arising, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due."

The January, 1974, note had been secured by a security interest in farm machinery and livestock; the December 29, 1977, note by farm machinery, two trucks and livestock; the June, 1978, note was unsecured; and the December, 1978, note again designated the real estate contract as security and also included a dragnet clause covering all existing and future indebtedness.

On July 9, 1979, the Tushes found themselves hopelessly in debt and filed a voluntary petition in bankruptcy in the United States District Court at Kansas City. Copies of a part of the bankruptcy proceedings have been included in the record on appeal as attachments to the trial court pleadings, and the original petition reflects that the Tushes had incurred in excess of $125,000.00 in debts. The schedules reflect total assets of a value of $114,916.77 of which $108,876.77 is claimed as exempt. The schedules to the petition also reflect that the Garnett State Savings Bank is listed as a secured creditor with the real estate contract covering the one-quarter section in Anderson County shown, along with certain tangible personal property, as security for the indebtedness due the Bank. Schedule B-4 to the bankruptcy petition lists the real property as homestead property and claimed as exempt under K.S.A. 1979 Supp. 60-2301. The value of the property is shown as $96,000.00. On January 4, 1980, the real property was set aside to the Tushes as exempt property by the trustee in bankruptcy and on January 10, 1980, an order was entered discharging the bankrupts. On August 14, 1980, the trustee, for some reason not reflected in the record, requested an order authorizing him to abandon the real estate and such an order was entered the next day. Shortly thereafter the bankruptcy proceedings were closed and on September 23, 1980, the Bank filed this action to recover on the promissory notes and to foreclose on its security.

The record does not reflect any pretrial order and the transcript of the trial in district court discloses that the only evidence submitted was the testimony of two officials from the plaintiff Bank, the notes and security agreements and a copy of the Durst

real estate contract. The defendants presented no testimony and relied upon their bankruptcy discharge as a defense. The Bank's action was premised on two theories. First, it contends it has a security interest under the Uniform Commercial Code (UCC) in the real estate contract which it claims is personal property and that it is perfected by its possession of the contract as escrow agent for the Dursts and the Tushes. In the alternative, the Bank claims to have either a specific or equitable lien upon the quarter section of real estate and seeks foreclosure against the property. The trial court found that as of the date of trial, April 10, 1981, the amount accrued under the notes in question amounted to $28,258.37 unpaid principal, plus interest of $8,675.11. Other findings of fact were consistent with the foregoing recitation of the facts herein.

The pertinent portions of the trial court's conclusions of law are:

"1. In the absence of the bankruptcy, Plaintiff's Exhibits 1 thru 5 [the notes hereinbefore described] would have been valid obligations of the defendants, George M. Tush, Jr. and Jacquelyn Tush.

"2. The discharge in bankruptcy removes the debts as personal obligations of the defendants, George M. Tush, Jr. and Jacquelyn Tush.

"3. The security agreements granted by Plaintiff's Exhibits #2 and Plaintiff's Exhibit #5 would have, in the absence of the bankruptcy proceeding, been sufficient to give rise to an equitable mortgage (*Beck v. Brooks,* 224 Kan. 300; *Fuqua v. Hanson,* 222 Kan. 653).

"4. An equitable mortgage [if] effective would have secured pre-existing indebtedness and such indebtedness as thereafter become [*sic*] due and would thus, if effective, be effective to secure all of the notes in Plaintiff's Exhibits #1 through #5, in accordance with the language of said exhibits (*Ingram v. Ingram,* 214 Kan. 415).

"5. There was no valid security interest acquired under the provisions of the U.C.C. by the plaintiff. . . .

" . . . .

"6. This action, because of my specific previous finding concerning no secured interest under the U.C.C., becomes one to establish an equitable lien. Before an equitable lien can be established there must be a valid pre-existing debt from which said equitable lien may be based. Because of the conclusion of law contained in paragraph 2 . . . there is presently no existing debt due from defendants, bankrupt Tushs, to the plaintiff. At the time of filing the petition in bankruptcy there was no lien effective in favor of plaintiff from defendants, the debt was discharged by the bankruptcy proceeding and there is now no debt existing which would allow the establishment of an equitable lien from the payment of such debt."

The court then entered judgment in favor of the defendants to

the effect that the Bank had no interest in the real estate contract or the land and quieted the Tushes' title to the property against the Bank. The Bank has appealed.

In arriving at its judgment, the court concluded that the Bank had no valid security interest under the UCC and no valid mortgage, equitable mortgage, lien or equitable lien which would be enforceable against the real property after the defendants' discharge in bankruptcy. We agree with the first conclusion of the trial court and disagree with the second. We think it is clear that generally the buyer's equity or interest acquired under a contract for the sale of real estate is an interest in the real property itself. This is particularly true when the contract is long term in nature, deposited in escrow and the buyers are placed in possession of the property with all of the incidents of ownership. See *Roberts v. Osburn*, 3 Kan. App. 2d 90, 589 P.2d 985, *rev. denied* 225 Kan. 845 (1979), and authorities cited therein. We find the argument of the Bank that it has a perfected security interest in the real estate contract as intangible personal property under K.S.A. 1981 Supp. 84-9-102 to be without merit. K.S.A. 1981 Supp. 84-9-104(*j*) makes it clear that the UCC does not apply to interests in or liens upon real estate.

Appellant's second argument is that if it does not have a security interest under the UCC, it has a security interest in the real property which is subject to being foreclosed. Defendants argue that the subject of a lien upon the real estate was never raised in the trial court and shouldn't be considered upon appeal. As previously indicated the only testimony before the trial court was that of William H. Craig, senior vice-president and a director of the Bank, and Loran Wilson, a loan officer at the Bank. Mr. Wilson only testified as to the balance due under the notes and not as to the security interest claimed by the Bank. While Mr. Craig's testimony is somewhat confusing, it appears obvious that the Bank was looking to the equity in the real property when the additional credit was extended in December, 1977. Did the Bank obtain an interest in the real property which survived bankruptcy and is subject to foreclosure? We think so.

The trial court was of the opinion that the security agreements would have been, absent the discharge in bankruptcy, sufficient to give rise to an equitable mortgage, and would have secured all five notes here in question. The court, however, based its con-

clusion that such liens would not survive the bankruptcy on the erroneous conclusion that an equitable lien to be valid must be supported by a pre-existing debt and that when the Tushes received their discharge in bankruptcy, the debts due the Bank were discharged and there then being no underlying debt an equitable mortgage or lien could not be established. This theory seems to have been based upon the belief that an equitable mortgage or lien does not arise until an action is brought to enforce the same. The trial court was in error in both of these conclusions. Defendants also assert that the security agreements were not in the proper form to constitute a valid mortgage or lien upon the property.

It has long been held that as between the parties, there are no special formalities required to create a mortgage upon real property. In *Assembly of God v. Sangster,* 178 Kan. 678, 680, 290 P.2d 1057 (1955), the court stated:

"Notwithstanding the fact there is a statute (G.S. 1949, 67-303) [K.S.A. 58-2303], which sets out a 'short form' of mortgage, it has been held that in order to create a mortgage contract no particular 'form' of instrument is necessary and no particular words are required. The 'form' of an agreement by which security is given is unimportant if the purpose plainly appears. All that is necessary is that there be a debt and that the instrument creates a *lien* on real property as security for the payment of the debt."

In *Beck v. Brooks,* 224 Kan. 300, 580 P.2d 882 (1978), the court held:

"Where one party advances money to another upon the faith of an agreement by the latter to secure its payment by a mortgage upon specified lands, but which mortgage is never executed, or which, if executed, is so defective or informal as to fail in effectuating the purpose of the execution, equity will impress upon the land intended to be mortgaged a lien in favor of the creditor who advanced the money for the security and satisfaction of his debt." Syl. ¶ 1.

*Fuqua v. Hanson,* 222 Kan. 653, 567 P.2d 862 (1977), stated the rule as follows:

"The form of an agreement by which security is given for a debt is unimportant. If the purpose and intention behind a transaction is to secure a debt, equity will consider the substance of the transaction and give effect to that purpose and intention. A court sitting in equity is not governed by the strict rules of law in determining whether a mortgage has been created. The lien follows if the evidence discloses an intent to charge real property as a security for an obligation." Syl. ¶ 1.

It is also well established that an equitable lien or mortgage

takes effect at the time of the original transaction between the parties and not at the time of attempted enforcement. In *Fitzgerald v. Fitzgerald,* 97 Kan. 408, 155 Pac. 791 (1916), it was said:

"One to whom the owner of land is indebted, and who orally agrees to and does lend money to the landowner with which to pay some of his debts, and who promises to and does pay other of the landowner's debts, and promises to and does become surety for the landowner for other of his debts, on the agreement of the landowner that he will deed to the other certain lands to secure him for the debts, money loaned, money paid and obligations incurred, becomes an equitable mortgagee of the lands agreed to be conveyed *from the time of making such agreement;* . . . ." Syl. ¶ 1. (Emphasis added.)

The agreement to subject the property in this case to the interests of the Bank occurred long before the filing of the petition in bankruptcy or the petition in this action. A mortgage, if any, occurred at the time of the execution of the security agreements.

In *Roberts v. Osburn,* 3 Kan. App. 2d 90, the Court of Appeals held:

"When parties enter into a contract for the sale of real estate pursuant to which the seller retains legal title as security for the purchase price and all of the beneficial incidents of ownership pass to the buyer, the seller has no greater rights than he would possess if he had conveyed the property and taken back a mortgage, and the buyer becomes the 'owner' when the beneficial interest passes to him." Syl. ¶ 5.

For an excellent discussion of the doctrine of equitable mortgages, in a case quite similar to the one now before the court, see *Hill v. Hill,* 185 Kan. 389, 345 P.2d 1015 (1959).

When the Tushes gave a security interest in their property to secure a debt to the bank, they were giving a security interest in their equitable title to the real estate. As such, the Bank obtained an interest in real estate, not personalty. Even though the security agreement did not meet the statutory requirements for real estate mortgages in that it was not properly acknowledged (K.S.A. 58-2303) or recorded (K.S.A. 58-2221), the instrument created an equitable mortgage in the real estate which was valid between the parties (K.S.A. 58-2223) to secure the debt which existed at the time of the agreement.

The trial court was of the opinion that the security interest could not survive the Tush bankruptcy proceedings because the personal obligation of the Tushes on the notes was no longer

collectible. The trial court's conclusion in this respect was clearly erroneous.

In an early Kansas case, this court held that although a personal judgment could not be obtained against a debtor who had taken bankruptcy, a prior attachment of real property did survive a bankruptcy discharge under the law then in existence. *Gillett & Co. v. McCarthy*, 23 Kan. 668 (1880).

In the early case of *Long v. Bullard*, 117 U.S. 617, 29 L.Ed. 1004, 6 S.Ct. 917 (1886), the United States Supreme Court said that a bankruptcy discharge does not release the lien of a mortgage on the debtor's homestead when the mortgage was created before bankruptcy. The court also said that the existence and vitality of the lien depended on state law.

"Consequently his [the creditor's] security was preserved notwithstanding the bankruptcy of his debtor. [Citations omitted.] The dispute in the court below was as to the existence of the lien at the time of the commencement of the proceedings in bankruptcy. That depended entirely on the State laws, as to which the judgment of the State court is final and not subject to review here.

"The setting apart of the homestead to the bankrupt under § 5045 of the Revised Statutes did not relieve the property from the operation of liens created by contract before the bankruptcy. It is not the decree in this case which constitutes the lien on the property, but the conveyance of Long and wife before the bankruptcy." p. 621.

In the case of *Butler Bros. v. Twineham*, 134 Kan. 547, 550, 7 P.2d 531 (1932), the court pointed out that a discharge in bankruptcy does not extinguish a debt. There it was held that a surety was still responsible for a debt even though the bankrupt principal was personally discharged. We noted that the discharge only affected the remedy for collecting a debt personally from the debtor.

In *Commodore v. Armour & Co.*, 201 Kan. 412, 441 P.2d 815 (1968), the court again recognized that a valid existing lien would be unaffected by bankruptcy. In a quote from a federal case the court adopted the statement that, "[t]he law does not continue an obligation [post-bankruptcy] in order that there may be a lien, but only *does so because there is one.*" p. 418. (Emphasis added.)

The Tush bankruptcy was filed before the effective date of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et seq.* (Supp. V, 1981), and therefore is not affected by the new act. *United States v. Security Industrial Bank* (Slip Opinion 81-184 decided November 30, 1982). 9 Am. Jur. 2d, Bankruptcy § 648 (1963), in

discussing title to exempt property under the former bankruptcy act, states:

"Title to, as distinguished from the custody of, exempt property does not vest in the trustee. It remains in the bankrupt. Exempt property constitutes no part of the bankrupt estate, and the jurisdiction of the court of bankruptcy over such property is limited to the functions of ascertaining what property is exempt and of setting off to the bankrupt such property as is found to be exempt." p. 490.

At § 662 it is stated:

"Rights in exempt property under a contract with the bankrupt are not defeated by the bankruptcy proceeding or their enforcement precluded after the petition in bankruptcy is filed, and the setting apart of the homestead to the bankrupt as exempt property does not relieve the property from the operation of liens created by contract before the filing of the petition in bankruptcy. If the property set aside to the bankrupt as exempt is affected by liens, it continues to be so affected." p. 498.

In *Johnson v. Bondurant*, 187 Kan. 637, 359 P.2d 861 (1961), this court held:

"A discharge in bankruptcy does not operate to destroy or extinguish the debt, but it does effect a release of the bankrupt which bars enforcement of the collection of the debt as against him if he chooses to avail himself of it."

"A discharge in bankruptcy is personal to the bankrupt but does not affect secondary liability." Syl. ¶¶ 2, 3.

Thus it is clear that in Kansas, as in most if not all other states, while a discharge in bankruptcy will prevent the bankrupt from being personally liable on a dischargeable debt, the debt itself is not extinguished and a creditor holding a security interest in exempt property may look to that property for satisfaction of the debt. In the instant case, the Bank made it clear during trial that it was not seeking personal judgments against the Tushes but was looking only to its security for payment. In other words, the action was one *in rem* against the property and not *in personam* against the Tushes.

The trial court was in error when it concluded that the Bank did not have a security interest in the real property which was subject to foreclosure. Under the Durst real estate contract the only security or collateral that the Tushes had to pledge to the Bank was their equity in the real estate.

One other item remains. Do the security instruments which gave the Bank a security interest in the equity of the Tushes in the real property cover all of the indebtedness owed the Bank? We think the trial court was correct in its conclusion that if there was an actual or equitable mortgage then the same would cover

all the indebtedness. The effect of a clause securing future advances, commonly called a dragnet clause, was discussed at length in *Emporia State Bank & Trust Co. v. Mounkes,* 214 Kan. 178, 519 P.2d 618 (1974). In *Mounkes* it was held:

"Where a mortgage is given to secure a debt specifically named, the security will not ordinarily be extended to cover debts subsequently incurred unless they be of the same class or character and so related to the primary debt secured that the assent of the mortgagor can be inferred."

"In the absence of clear evidence of a contrary intention, a mortgage containing a dragnet type provision will not be extended to cover subsequent advances or loans unless they be of the same kind and quality or relate to the same transaction or series of transactions or unless the document evidencing the same refers to the mortgage as providing security therefor." Syl. ¶¶ 5, 6.

See also *First Nat'l Bank & Trust Co. v. Lygrisse,* 231 Kan. 595, 647 P.2d 1268 (1982). An examination of the notes in this case clearly shows that all of the indebtedness was related to the Tush farming operation and therefore is of the same class or character and is covered by the security interest in the land.

The record furnished in this case indicates that the Tushes filed cross-claims against each other which were declared moot by the trial court due to the decision reached by the trial court. As the decision against the Bank must be reversed, on remand the court shall take such further action as may be necessary to resolve the claims between Mr. and Mrs. Tush.

The judgment of the trial court is reversed and the case is remanded with directions to enter judgment *in rem* in favor of the Bank for the total indebtedness and to proceed with foreclosure of the interest of the Tushes in the real property and for such other proceedings as may be necessary to comply with the views set forth herein.