No. 57,835

MICHAEL C. BECKER, *Plaintiff/Appellee*, v. DEAN BUMAN, *Defendant/Appellee*, RANDALL MARSH, *Defendant*, and ALLEN COUNTY BANK & TRUST, *Appellant*, v. PATRICIA A. BECKER, *Third-Party Defendant/Appellee*.

(721 P.2d 246)

Opinion filed June 13, 1986.

*James M. Immel*, of Immel & Immel, of Iola, argued the cause and was on the brief for appellant.

*Daniel Dale Creitz*, of Hines & Ahlquist, P.A., of Erie, argued the cause, and *Daryl D. Ahlquist*, of the same firm, was with him on the brief for plaintiff-appellee Michael C. Becker and third-party defendant/appellee Patricia A. Becker.

*Robert Pennington*, of Henshall, Pennington & Brazil, of Chanute, argued the cause and was on the brief for defendant/appellee Dean Buman.

The opinion of the court was delivered by

MCFARLAND, J.: Plaintiff Michael C. Becker was awarded, in a jury trial, the sum of $69,820.65 against defendant Allen County Bank and Trust on plaintiff's claim that the Bank wrongfully disbursed certain funds.

Before proceeding to a statement of the facts, it should be noted the testimony in two key areas was sharply conflicting—namely what the bank officer did or did not agree to do at the time Mr. Becker obtained his loan from the Bank and what role the Bank played in the real estate closing. However, when a verdict is attacked on the grounds that it is contrary to the

evidence, the appellate court must review the evidence with all reasonable inferences to be drawn therefrom in the light most favorable to the prevailing party below. See *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.*, 236 Kan. 183, 690 P.2d 380 (1984). With this duty in mind, the facts are summarized as follows. Michael Becker operates a business known as Chanute Iron and Supply Company. On March 19, 1979, Becker and defendants Dean Buman and Randall Marsh entered into a written agreement whereby Buman and Marsh, d/b/a Marsh Construction Company, would build a house on speculation in Iola. Buman and Marsh were customers of Becker's. Becker was to provide the financing, would be paid two percent above his cost of borrowing the construction money, and would receive a mortgage on the land involved. The same day, Becker deposited $10,000 in the Bank in a new checking account in which each of the three were signatories. Four days later Buman and Marsh, from the account's funds, purchased the lot in Melody Acres Subdivision for $7,500 on which the house was to be built. Title was taken in the names of Buman and Marsh. Becker did not receive a mortgage thereon.

Either on March 19 or April 20, 1979, a meeting was held at the Bank. Attending the meeting were Becker, Buman, Marsh and Ray Pershall (Chief Executive Officer and President of the Bank). The purpose of the meeting was for Becker to secure a $50,000 loan from the Bank for construction of the house in Melody Acres. Becker briefly explained the arrangement he had with the contractors. The bank officer agreed to an unsecured loan of the money—the same to be placed in the construction account on an as-needed basis. The bank officer further agreed that when the house was sold the Bank was to apply the funds received from the sale of the house to cancel out the note and then disburse the balance to Becker, Marsh and Buman in accordance with their agreement. The house was built, but Becker was required to borrow an additional $10,000 from the Bank in July 1979 for construction costs. Additionally, Buman borrowed some $10,000 from the First National Bank of Chanute to complete construction and a first mortgage was given on the real estate as security therefor. Although finished, the house did not sell immediately. In October 1979 the due date of the loan was extended and then again extended in January of 1980.

344

Meanwhile, a second series of events was unfolding which did not directly involve Becker but which was to substantially affect him. On May 10, 1979, Buman and Marsh borrowed $65,000 from the defendant Bank to pay construction costs of a house they were building in Horde's Addition to the City of Iola. The Bank held a mortgage on the Horde's Addition property as security. This loan was renewed in November 1979 when $96,160.97 was owed thereon. This note went into default in January 1980. The Bank realized it was undersecured on the Horde's Addition property and started pressing Marsh and Buman for repayment of the loan. The Bank kept close track of the listing realtor's progress in trying to sell the Melody Acres home. As Buman and Marsh testified, the Bank mixed the two transactions, looking for the sale of the Melody Acres property to aid its undersecured problem on the Horde's Addition house. Finally, a buyer was secured for the Melody Acres house. The closing was held at the Bank on or about August 15, 1980, with a bank officer presiding therein. All outstanding bills against the Horde's Addition house were paid by disbursements by the Bank from the proceeds of the Melody Acres house. Eight lots owned by the purchaser (Richard Knewtson) were taken in trade. The Bank prepared the closing statement. The sale price was $95,886.55. Specifically, the following occurred at closing: Credit of $23,500 was allowed for the lots (a figure the Bank participated in determining); and the balance was paid in cash. The Bank disbursed the proceeds as follows:

| | |
|---|---|
| Caldwell Floor Covering | $ 1,883.23 |
| Gray Lumber Company | 5,524.93 |
| Orrs Color Center | 820.96 |
| K-K Electric | 1,458.79 |
| Iola Ready Mix | 667.74 |
| Nelson Quarries | 17.34 |
| Immel & Immel | 35.00 |
| Iola Abstract Company | 708.00 |
| First National Bank of Chanute | 11,675.15 |
| Klotz Realty | 4,780.00 |
| Apt & Apt (Horde's Lbr. Co.) | 6,554.00 |
| Allen County Treasurer | 9,442.64 |
| Allen County Bank & Trust | 28,818.77 |
| 8 lots - City of Gas, Kansas (mortgage) | 23,500.00 |
| Total | $95,886.55 |

All sums disbursed to materialmen were for supplies furnished to the Horde's Addition house. The disbursement to the Allen County Treasurer was for payment of back taxes on the City of Gas lots. The lots themselves were disbursed to Marsh and Buman. Becker was not present at the closing and the Bank never sought nor secured his approval of the disbursements. The $28,818.77 the Bank disbursed to itself was credited to the Marsh-Buman loan on the Horde's Addition house. As previously stated, the closing and disbursements occurred on or about August 15, 1980. Prior to the closing the Bank had, on July 25, 1980, commenced an action against the two men for collection of the promissory note due on the Horde's Addition house.

Becker ultimately learned that none of the proceeds from the Melody Acres house had been credited against his loan to the Bank and brought this action on September 10, 1980, against the Bank and the two contractors. As against the Bank, Becker claimed it breached its agreement with him and had wrongfully disbursed the funds. At the time of the closing, Becker owed the Bank $69,820.65 on the notes.

The case was tried to a jury and the verdict held that the Bank had misapplied the following:

| | | |
|---|---|---|
| 1. | Caldwell Floor Covering | $ 1,883.23 |
| 2. | Gray Lumber Co. | 5,524.93 |
| 3. | Orrs Color Center | 820.96 |
| 4. | K-K Electric | 1,458.79 |
| 5. | Iola Ready Mix | 667.74 |
| 6. | Nelson Quarries | 17.34 |
| 7. | Immel & Immel | 35.00 |
| 8. | Iola Abstract Co. | 225.00 |
| 9. | Klotz Realty | 940.00 |
| 10. | Horde's Lumber Co. | 6,554.00 |
| 11. | Allen County Treasurer | 9,442.64 |
| 12. | Allen County Bank & Trust | 28,818.77 |
| 13. | Credit on lots taken in trade | 23,500.00 |
| | Total | $79,888.40 |

The trial court subtracted the Horde's Lumber Co. item of $6,554 on the basis the lumber company had a judgment against Marsh and Buman and affirmed the verdict as modified in the amount of $73,334.40. No claim of error is made relative to the deletion of

the Horde's Lumber Co. disbursement. Inasmuch as the mis-applied funds were greater than the debt owed by Becker to the Bank on the note, the trial court reduced the judgment to the amount due on the note ($69,820.65) and held the note was then paid in full. The Bank appeals from said judgment.

For its first claim of error the Bank contends there was insufficient evidence to support a finding the Bank agreed to credit the proceeds of the future sale of the home against the Becker loan. As previously noted, there was conflicting testimony on this issue, but there was sufficient evidence to support a finding that the agreement existed. Becker's testimony fully supports the existence of the agreement.

For its second issue the Bank contends it acted only as an escrow agent in the sale of the house and was, accordingly, without control or discretion in the disbursement of the funds and the Bank is entitled to judgment as a matter of law. There was evidence that the Bank acted as more than an escrow agent and had taken an active role in bringing about the sale. The Bank disbursed $28,818.77 of the proceeds to itself for an undersecured loan which was not related to the transaction. It had a financial interest in paying off the materialmen supplying material in the Horde's Addition house construction. Payment of these debts improved its own security position relative to the Horde's Addition loan. As will be recalled, the Bank had a suit pending against Marsh and Buman at the time of closing to collect that loan. Further, the Bank had previously agreed as a part of the Becker loan to credit the Becker loan first with the proceeds. The Bank made no effort to secure Becker's approval of the disbursements which were contrary to its agreement with Becker. We find this issue is without merit.

For its third issue the Bank claims the amount it disbursed to itself from the proceeds ($28,818.77) was protected by the doctrine of lis pendens. K.S.A. 60-2201(a) provides:

"When a petition has been filed in the district court pursuant to chapter 60 of the Kansas Statutes Annotated, the action is pending so as to charge third persons with notice of its pendency, and while pending no interest can be acquired by third persons in the subject matter thereof as against the plaintiff's claim; but such notice shall be of no avail unless the summons be served or the first publication made within ninety (90) days after the filing of the petition."

There are several difficulties with this argument. The Bank had sued Marsh and Buman at the time of the closing to foreclose

its mortgage on the Horde's Addition property. The proceeds involved were from the Melody Acres property. Hence, the subject of the Bank's action was not the Melody Acres property. Further, the Bank could not legitimately use lis pendens arising from its own lawsuit to breach its prior agreement with Becker. Further, Becker's interest in the proceeds was acquired long before the Bank's action was filed.

For its fourth issue the Bank argues that it was error to submit the matter of the City of Gas lots to the jury for consideration. The Bank argues those lots were traded in on the sale and, in essence, did not constitute proceeds which could be "misapplied." This point is wholly without merit. The lots were clearly proceeds from the sale and, under the agreement, Becker had an interest in them.

For its fifth issue the Bank claims there was insufficient evidence to submit instructions on the doctrine of constructive trust to the jury.

The jury was instructed as follows:

"INSTRUCTION NO. 19

"A constructive trust arises where a person by any form of unconscionable conduct or questionable ethics obtains property which in 'equity and good conscience he ought not to possess or which justly belongs to another.

"INSTRUCTION NO. 20

"Unconscionable conduct or questionable ethics is conduct which is one-sided, oppressive, unfairly surprising, or conduct that takes advantage of unequal bargaining or economic power.

"Mere disparity of bargaining strength, without more, is not enough to make out a case of unconscionability. Some element of deception or substantive unfairness must be shown."

The Bank does not contend these instructions constitute an erroneous statement of the law—only that the evidence was insufficient to support submitting the doctrine of constructive trust to the jury. Without reiterating what has previously been stated relative to the facts adduced at trial, we conclude there was sufficient evidence to support instructing the jury on the doctrine of constructive trust.

For its sixth issue the Bank argues the agreement (if any) between Becker and the Bank was unenforceable as violative of the Statute of Frauds.

K.S.A. 33-106 provides:

"**Specific cases where writing required.** No action shall be brought whereby to charge a party upon any special promise to answer for the debt, default or miscarriage of another person; or to charge any executor or administrator upon any special promise to answer damages out of his own estate; or to charge any person upon any agreement made upon consideration of marriage; or upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or concerning them; or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing."

The Bank argues the agreement was one "to answer for the debt . . . of another." Clearly, that was not the agreement. Next, the Bank argues that the agreement created an equitable mortgage on real estate and hence must be in writing. This argument is equally unpersuasive. If mortgages are fully set forth in writing, the doctrine of equitable mortgage never comes into play. As we stated in *Garnett State Savings Bank v. Tush,* 232 Kan. 447, 657 P.2d 508 (1983):

"Where one party advances money to another upon the faith of an agreement by the latter to secure its payment by a mortgage upon specified lands, but which mortgage is never executed, or which, if executed, is so defective or informal as to fail in effectuating the purpose of the execution, equity will impress upon the land intended to be mortgaged a lien in favor of the creditor who advanced the money for the security and satisfaction of his debt. [Citation omitted.]"

"The form of an agreement by which security is given for a debt is unimportant. If the purpose and intention behind the transaction is to secure a debt, equity will consider the substance of the transaction and give effect to that purpose and intention. A court sitting in equity is not governed by the strict rules of law in determining whether a mortgage has been created. The lien follows if the evidence discloses an intent to charge real property as a security for an obligation. [Citation omitted.]"

"One to whom the owner of land is indebted, and who orally agrees to and does lend money to the landowner with which to pay some of his debts, and who promises to and does pay other of the landowner's debts, and promises to and does become surety for the landowner for other of his debts, on the agreement of the landowner that he will deed to the other certain lands to secure him for the debts, money loaned, money paid and obligations incurred, becomes an equitable mortgagee of the lands agreed to be conveyed from the time of making such agreement. [Citation omitted.]" Syl. ¶¶ 2, 3, 4.

By their inherent nature, equitable mortgages are not within the Statue of Frauds.

For its seventh issue the Bank claims the trial court erred in directing a verdict on its cross-claim against Buman. This issue involves a whole new set of facts concerning the Bank's relationship with Buman and Marsh. Little would be gained by

setting forth the facts herein relative to this claim. It is sufficient to state that we have carefully considered the issue and, although the trial court may have based its dismissal on the wrong grounds, there is a valid reason for the court's action. The cross-claim sought indemnification for any judgment which might be rendered against the Bank on Becker's petition. Becker's claim against the Bank was based solely on the alleged wrongdoing of the Bank itself in violating the agreement between the Bank and Becker. Under these circumstances, an action for indemnification would be inappropriate. See generally *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 657 P.2d 517 (1983).

The judgment is affirmed.

HERD, J., dissenting: For easy reference and different emphasis, I will restate the facts. Michael Becker operates the Chanute Iron and Supply Company, a wholesale plumbing business. As such, he engaged in business with Randall Marsh and Dean Buman. Marsh operated the Marsh Construction Company, which built houses. Buman installed plumbing, heating and air conditioning in the houses Marsh built. Buman had been a customer of Becker's for a number of years.

In 1979, Marsh and Buman went to the Allen County Bank and Trust, spoke with Ray Pershall, Bank president, and requested a loan to construct a speculative house in Iola. Mr. Pershall denied their request because of their lack of equity and inadequate financial statement.

Marsh and Buman then approached their friend and business associate, Michael Becker, for financial help. Becker agreed to borrow the money from the Allen County Bank and lend it to Marsh and Buman. Marsh and Buman were to take title to the property and give Becker a note secured by a first mortgage on the real estate. Becker was to receive 2% interest above the Bank interest rate. This agreement was reduced to writing by Becker's attorney.

On March 19, 1979, the three entrepreneurs proceeded to the Allen County Bank and Trust where they again met with Ray Pershall. After examining Becker's property statement and checking with his Chanute Bank, Pershall agreed, on behalf of the Bank, to loan Becker $60,000 on his financial statement. This amount was advanced by the Bank when requested by Becker

and deposited in a checking account from which Marsh and Buman were authorized to draw. With these funds, Marsh and Buman purchased the Melody Acres lot, titled it in their names, and constructed a house upon it. Becker neither asked for nor received a note or mortgage from Marsh and Buman.

The house was completed in July of 1979. It did not sell well when first offered and was not sold by October 20, 1979, when the note was due. Becker renewed the note plus accrued interest at an increased interest rate of 14%. The note was again renewed on January 20, 1980, at the same 14% interest rate.

In the meantime, Ray Pershall retired from Allen County Bank and Trust and Bill James became Bank president. Mr. James loaned Marsh and Buman $96,160.97 to build another speculative house (Horde's Addition) in Iola. The Bank's first mortgage on the Horde's Addition property secured only $65,000 of the cost. In addition, there were unpaid materialmen bills on this house. This became a problem loan for the Bank.

When the Melody Acres house was completed there were some unpaid bills for supplies. Marsh and Buman borrowed funds from the First National Bank of Chanute to discharge these obligations and gave that Bank a first mortgage on the property as security. Since neither Becker nor the Allen County Bank held a lien on the Melody Acres house, neither knew of this transaction until later.

The Allen County Bank brought suit against Marsh and Buman in Allen County on the note on the Horde's Addition house on July 25, 1980. On May 13, 1980, Marsh and Buman, through Klotz Realty, finally entered into a contract for sale of the Melody Acres house with Richard Knewtson for the sum of $96,000; but to obtain this amount they had to accept a trade of lots in Gas, Kansas, valued at $23,500. The sale was closed at the Allen County Bank and Trust on August 15, 1980. Allen County Bank acted as agent for the sellers and the purchaser. The Bank received the funds from Knewtson and distributed them as directed. The Bank's only claim to the proceeds of the sale of the Melody Acres house came through lis pendens on its lawsuit involving the Horde's Addition house. Becker's claim to the proceeds of the sale came through his contract with Marsh and Buman and an alleged oral contract with the Allen County Bank. The Bank distributed the sale proceeds to pay the liens on both

the Melody Acres house and the Horde's Addition house and credited $28,818.77 on Marsh and Buman's note to the Bank. The Marsh and Buman note was the subject of the lawsuit on the Horde's Addition property.

Mr. Becker brought this action against Allen County Bank alleging it orally agreed to apply the proceeds of the sale of the Melody Acres house on his note to the Bank. Absent such a contract, the Bank had no such obligation to Becker. Neither Becker nor the Bank had any interest in the Melody Acres house. Becker had a contractual right to a first mortgage on the house which he opted not to exercise. Had he done so, this lawsuit would not have occurred. Marsh and Buman had the legal right to handle the house as they chose. They illustrated that right by giving the First National Bank of Chanute a first mortgage on the Melody Acres house, the priority of which no one challenges.

The nexus of this case is the existence of an oral contract between the Allen County Bank and Trust and Michael Becker. There are three strong reasons why the existence of an oral contract should not have been submitted to the jury, each of which are questions of law for resolution by the court.

The first is if there was such an oral contract, it violated the Statute of Frauds and is void and unenforceable. K.S.A. 33-106 provides in pertinent part:

"No action shall be brought whereby to charge a party upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing."

Marsh and Buman owed Becker $65,000; Becker owed Allen County Bank $65,000. The house belonged to Marsh and Buman. The Bank had no interest in the house and owed Becker nothing. The oral contract claimed by Becker places a burden on the Bank to pay the debt of Marsh and Buman to Becker from the proceeds of the sale of the Melody Acres house. That is an oral agreement to pay the debt of another and, as such, is void and unenforceable. The reason for the rule is to prevent claims such as Becker's. The trial court erred in not so holding.

In addition to being void and unenforceable under the Statute of Frauds, the contract was also void for impossibility of performance. Marsh and Buman owned the Melody Acres house in

which the Bank had no interest. Thus, the Bank had no control over the disposition of the house or the proceeds of its sale. This is illustrated by Marsh and Buman giving a mortgage on it to the First National Bank of Chanute.

If performance is impossible because of conditions existing at the time the contract was made, the agreement is void. See 17 Am. Jur. 2d, Contracts § 106:

"However improbable or absurd performance of a promise may be, the promise is binding if performance is possible; but if performance is impossible because of facts existing when the promise is made, the promise is void, at least where the impossibility is known to the parties, unless the risk of its impossibility is assumed, as where the parties know that performance may be impossible and base their contract upon this assumption. So too, where an obvious legal or physical impossibility of performance appears on the face of the contract, the contract is void."

See also Restatement (Second) of Contracts § 266(1) (1979); Annot., 84 A.L.R.2d 12.

Thus, even if the Bank did agree to apply the proceeds of the Melody Acres house to Becker's note with the Bank, the agreement was void.

Finally, the case should not have been submitted to the jury because there is no substantial, competent evidence that the Bank agreed to credit the proceeds of the future sale of the house against the Becker loan. Michael Becker, Randall Marsh, Dean Buman and Ray Pershall were present in the Allen County Bank and Trust on March 19, 1979, when the alleged oral contract was entered into. Becker testified Marsh and Buman agreed to pay their note to him out of the sale of the house. While it is true that Marsh and Buman agreed in writing to give Becker a first mortgage on the house, Becker neglected to obtain that mortgage. Becker further testified that Pershall agreed on behalf of the Bank to pay Becker's note to the Bank from the sale of the Melody Acres house. Marsh, Buman and Pershall all deny such an agreement was made.

Becker's testimony lacks substantiality for a number of reasons. First, there was no reason for such a promise since Marsh and Buman agreed to give Becker a first mortgage on the property. Second, such a promise from the Bank was impossible to perform as the Bank had no interest in the house. At the time the loan was made to Becker the house was a mere speculation. Marsh and Buman did not even have a lot upon which to

construct a house at that time. Third, the Bank was receiving nothing for making such a promise since the loan was made to Becker solely upon his financial statement. To believe Becker's testimony defies logic, rendering his evidence insubstantial.

It has long been the rule that when a verdict is attacked on the ground it is contrary to the evidence, it is not the function of an appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in a light most favorable to the successful party below, will support the verdict this court should not intervene. *Manley v. Wichita Business College,* 237 Kan. 427, 432, 701 P.2d 893 (1985). The duty of this court extends only to a search of the record for the purpose of determining whether there is any competent, substantial evidence to support the findings. *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 684, 602 P.2d 1326 (1979). "Substantial evidence" is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 393, 681 P.2d 1038, *cert. denied* 105 S. Ct. 365 (1984).

If this definition of "substantial" is to have any meaning, then evidence must be sufficient in both amount and credibility to justify its submission to a jury. While Becker was a competent and credible witness, his testimony lacked quantitative substantiality in light of other evidence and circumstances shown by the record. The majority notes there was conflicting testimony as to whether the Bank agreed to credit the proceeds of the future sale of the home against the Becker loan. However, the majority then simply states "Becker's testimony fully supports the existence of the agreement." In reality, the majority has decided it need only search the record to determine whether *any* evidence supports the verdict. Such a determination renders the "substantial, competent evidence" standard meaningless and ineffective.

The jury system deserves the court's respect and support. However, it works properly only when the trial is a cooperate effort between the court and jury. It is the court's duty to remove a case from a jury's consideration where no substantial compe-

tent evidence exists to support the verdict. Here, not only was there no substantial competent evidence to support the plaintiff's allegations, but if such an oral contract existed it was void for impossibility of performance and unenforceable under the Statute of Frauds. The trial court erred in failing to direct a verdict for the defendant, Allen County Bank and Trust. I would reverse.