233 Cal.App.3d 103 (1991)
284 Cal. Rptr. 367
PETERSON DEVELOPMENT COMPANY, INC., et al., Plaintiffs and Appellants,
v.
TORREY PINES BANK et al., Defendants and Respondents.
Docket Nos. D012843, D013435.
Court of Appeals of California, Fourth District, Division One.
August 9, 1991.
*107 COUNSEL
Thor O. Emblem and Tracy L. Emblem for Plaintiffs and Appellants.
Brobeck, Phleger & Harrison, William D. Baldwin, William F. Sullivan and Michael J. Barry for Defendants and Respondents.
[Opinion certified for partial publication.[1]]
OPINION
HUFFMAN, Acting P.J.
The trial court granted a motion for summary judgment made by defendants Torrey Pines Bank (TPB) and Torrey Pines Equity Corporation (TPEC) in this action by Peterson Development Company, Inc., and its president and sole shareholder, Eric Peterson (collectively Peterson). Subsequently, the court awarded attorney's fees to TPB and TPEC pursuant to a contractual attorney's fees clause. Peterson's action for damages against TPB and TPEC arose out of a construction loan transaction and alleged theories of breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud. In this appeal by Peterson of both the summary judgment order and the attorney's fees award, the issues presented include the enforceability as a contract of a letter of commitment to provide permanent financing, and the potential liability of TPB as a fiduciary in connection with its performance of escrow services as part of its loan processing procedures. We conclude the trial court correctly entered summary judgment for TPB and TPEC and properly awarded attorney's fees under Civil Code section 1717. We affirm and award attorney's fees on appeal, while denying the parties' requests for sanctions on appeal.

FACTUAL AND PROCEDURAL BACKGROUND
In November 1984, Peterson's chairman Eric Peterson signed the documents required to obtain a $492,000 construction loan from TPB to finance a seven-unit subdivision on Geneva Place in Escondido. Several months earlier, in negotiating for the loan, Peterson's chief financial officer Tracy Emblem (Tracy) and its president Thor Emblem (Thor) (respectively, daughter and son-in-law of Eric Peterson) had discussed the financing at a meeting with TPB's senior vice-president Walter Strangman. At that meeting, Peterson claimed, Strangman orally represented TPB would make the construction loan and would also provide permanent financing upon the project's completion, as well as extending the construction loan's one-year term if necessary.
*108 The facts of the transaction, as shown in the moving, opposing, and replying summary judgment papers, disclose that when Tracy, Thor, and Eric Peterson arrived at TPB to sign the loan papers, Strangman was not available. The loan processor gave them the papers to sign and said Strangman would sign later and copies would be provided. Eric Peterson signed a number of loan documents, notably the building loan agreement and a "Letter of Commitment" for permanent financing.[2] The TPB loan agreement, attached as exhibit A to Peterson's first amended complaint (the operative pleading in the case), defines the contract term "Permanent Lender" as "TPEC" (a wholly owned subsidiary of TPB), and states the term for "Permanent Commitment Expiration Date" is not applicable. In paragraph 4.1.15 of the loan agreement, a condition precedent to the recordation of the loan documents is stated: "a letter or other written acknowledgement from the Permanent Lender that the Permanent Commitment is in full force and effect." The letter of commitment was issued by TPEC, and required by its terms a payment of $4,920 for a commitment to provide permanent financing on the project. It provided: "This commitment is not effective until the fee is paid and this commitment is fully signed by both parties below."[3]
The moving, opposing and reply papers presented evidence about TPB's escrow procedures. According to Strangman, TPB processed the loan documents internally, without using an external escrow or loan escrow. Although TPB's loan processor, Bess Beagle, testified at her deposition that TPB did not have a separate escrow department, Strangman testified at deposition that TPB's escrow department had prepared a loan escrow statement, and that such statements were ordinarily provided to the borrower. Copies of the other loan documents were also supplied to Peterson, with the exception of the letter of commitment. (See fn. 3, ante.) The escrow statement recites that it covers money settlement "through escrow only," and shows all funds disbursed from the loan proceeds, which included $12,300 for loan fees. The usual processing services for a real estate transaction were performed, such as notarizing and recording documents and obtaining title insurance. No charge for escrow fees appears on the statement. A commercial loan checklist was also used, listing "TPB escrow" as the disbursement instruction recipient.
*109 At the bank, Peterson also signed loan disbursement instructions with a typed entry of $12,300 for loan fees; handwritten entries show $7,380 was allocated to TPEC and $4,920 to TPB. Cashier's checks were issued by TPB, signed by Strangman, paying TPEC $7,380 out of the loan proceeds, which represented a permanent loan commitment fee of $4,920 and a broker referral commission of $2,460. Although Peterson received the escrow statement listing $12,300 total loan fees after signing the papers, as of the fall of 1985, Peterson had no documentation showing TPEC had been paid for issuing a permanent financing commitment.
By the fall of 1985, construction of the subdivision was almost completed and the construction loan was coming due (on Nov. 27, 1985). One day when Strangman and Thor were both visiting the site, Thor asked Strangman whether TPB or TPEC would supply the permanent financing for the project. According to Thor's deposition, Strangman replied "they decided not to do that." According to Tracy's declaration in opposition to the motion for summary judgment, Strangman said TPEC was no longer making permanent financing.
According to Thor's deposition and Tracy's declaration in opposition to the summary judgment motion, Peterson did not pursue the matter by demanding permanent financing from TPB or TPEC because it did not want to upset their relationship, and because it had no copy of the letter of commitment or any knowledge of documents showing TPEC had been paid for issuing the permanent financing commitment. Thor testified at his deposition he did not learn of the existence of the letter of commitment until the later Westwind litigation, but earlier, "we knew that we had paid for some kind of take-out commitment." Thor's deposition testimony also stated he believed the promise of permanent financing was based on the language of the letter of commitment and "the facts of the relationship" between Peterson and TPB/TPEC. Those facts included the condition of the construction loan that a take-out commitment be provided, and TPEC's providing of such a commitment for a fee. However, he admitted that he didn't know of any conversations in which TPB or TPEC promised to provide permanent financing for the project, that he didn't believe there was any existing commitment to provide such financing at the time it was denied, and that the building loan agreement naming TPEC as the permanent lender did not trigger any thought in his mind that a permanent loan commitment existed.
On his part, Eric Peterson testified at deposition that he believed he had obtained from TPB and TPEC "a construction loan and a permanent loan," based on what Thor and Tracy had told him. However, he had no knowledge of any conversations between TPB or TPEC and any Peterson representatives on the issue of a permanent financing commitment. In his opinion, the *110 loan fees charged (two and one-half points) were about what he was used to paying on similar projects. Peterson also testified he believed from his reading of the loan documents that TPB/TPEC had the discretion to decide whether to make any further loans on the project.
In Strangman's deposition, he stated he originally planned to use the letter of commitment to generate fees for TPEC, but decided not to do so before the loan was funded, for some reason he couldn't remember. The letter of commitment was prepared and presented to Peterson because of a breakdown in communication between Strangman, another bank official (Torres) and the loan processor. It was not TPB's usual practice to require a permanent loan commitment before funding a construction loan.
After learning from Strangman at about the time of completion of the project that no permanent financing would be forthcoming, Peterson contacted other lenders and reached an agreement for permanent financing with Westwind Mortgage Company (not a party to this action). Westwind told Strangman it would still finance the project even if a notice of default were filed. No extensions were granted on the construction loan although Thor may have asked for one. On February 6, 1986, TPB filed a notice of default on the construction loan after Peterson did not pay on time. Westwind then refused to make its loan. After some delays caused by Peterson's filing for bankruptcy, TPB obtained relief from the bankruptcy stay and took the property by foreclosure.
Peterson sued Westwind in June 1986 on similar theories as are here alleged against TPB and TPEC: breach of contract, bad faith denial of contract, bad faith breach of contract, actual fraud, and negligent misrepresentation. In discovery in that action, Peterson obtained a copy of the unsigned letter of commitment, which had the words "Not utilized" written across it.[4] Peterson also obtained a copy of the escrow check for $7,380 to TPEC and a loan committee report showing TPEC was to receive $7,380 for loan and referral fees, with this notation: "Perm. loan commitment TPEC."[5] Westwind went bankrupt and Peterson did not pursue that action further.
In October 1988, Peterson brought this action against TPB and TPEC on the theories of breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and constructive fraud.[6] It *111 claimed it entered into the loan agreement because of the representation that permanent financing would be provided for the project, and the letter of commitment constituted a written contract that was breached when TPEC refused to provide that financing. TPB and TPEC's motion for summary judgment (Code Civ. Proc., § 437c)[7] soon followed, based on the argument there was no valid signed, written contract for permanent financing and no failure to disclose any such nonexistent document. In opposition, Peterson asked for more time to conduct discovery and argued the documents were consistent with the bank's alleged oral promise to provide permanent financing and its alleged concealment of the payment of the permanent financing fee and its failure to sign the letter.
The reply papers in support of the motion for summary judgment (filed by newly substituted counsel for TPB/TPEC) emphasized a defense that the two-year statute of limitations (§ 339) barred any claim based on oral contract or breach of covenant, and argued no fiduciary relationship between Peterson and TPB/TPEC, debtor and creditor, existed as a matter of law. The reply also claimed with reference to the constructive fraud cause of action that there could be no justifiably delayed discovery of Peterson's claims since Peterson knew about Strangman's representations, the letter of commitment, and the loan fees total amount when the documents were signed. Absent any fiduciary relationship, the reply argued, there was no duty to disclose the internal breakdown of the loan fees.
At oral argument before Judge LaVoy on the motion for summary judgment, the court and counsel focused on the issue of the breakdown of the loan fees and what the amount paid to TPEC out of loan proceeds represented. At the end of argument, counsel for TPB/TPEC reiterated his position the key issue was the statute of limitations for an oral contract. The motion was granted. Thereafter, Peterson moved for reconsideration of the order, supplying documentary evidence from recently taken depositions of Strangman and the loan processor Bess Beagle. Reconsideration was denied and summary judgment was entered. Peterson appeals.
TPB/TPEC moved for an award of attorney's fees under Civil Code section 1717, based on the attorney's fees clause in the letter of commitment. The trial court (Judge Hollywood) made an award of $83,150.59 and ordered a bond to be posted for the appeal. Peterson petitioned this court for a writ of supersedeas (D013104), which was granted on October 24, 1990, staying enforcement of the judgment for costs, expediting the appeal and providing no extensions would be granted. (1) (See fn. 8.) Peterson has appealed the *112 attorney's fees order, and its two appeals were consolidated by stipulation of the parties.[8]

DISCUSSION
(2) In reviewing this summary judgment, the rules set forth in Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107 [252 Cal. Rptr. 122, 762 P.2d 46], must be applied:
"A motion for summary judgment `shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.] Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.] [¶] Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. [Citation.] It should therefore be used with caution, so that it does not become a substitute for trial. [Citation.] The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. [Citation.] Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citation.] [¶] A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must conclusively negate a necessary *113 element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial."
Our analysis of this record requires discussion of three separate issues: the enforceability of this letter of commitment under contract principles, the scope of duty undertaken by TPB in its performance of the loan escrow function, and the propriety of this award of attorney's fees.

I

Enforceability of the Letter of Commitment
To support its contention the letter of commitment, even though unsigned by TPEC, represented an enforceable written contract, Peterson makes two related arguments. (3) It first relies on the general rule of Civil Code section 1642[9] that "several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract. [Citation.]" (Nevin v. Salk (1975) 45 Cal. App.3d 331, 338 [119 Cal. Rptr. 370].) Although the language of this section speaks in terms of "contracts," it is generally recognized: "The term `contract' as used in the code section is descriptive only of a writing and, in reality, refers to an `instrument.' [Citations.]" (Harm v. Frasher (1960) 181 Cal. App.2d 405, 413 [5 Cal. Rptr. 367].) (4) Peterson also cites the rule of Civil Code section 1621,[10] that "[a]n agreement may be established by the acts and conduct of the parties and all of the circumstances of the case." (Penn Sec. Life Ins. Co. v. Rising (1976) 62 Cal. App.3d 302, 308 [133 Cal. Rptr. 59].)
Applying these rules, Peterson relies on the construction loan agreement, which required by its terms "a letter or other written acknowledgment from the Permanent Lender that the Permanent Commitment is in full force and effect." The agreement also defined the contract term "permanent lender" as "TPEC." When this agreement and the letter of commitment are read together, Peterson claims, the letter should be considered to be a fully executed agreement, in light of the consideration paid for it out of Peterson loan proceeds, and in light of Peterson's alleged reliance on its "promise" of permanent financing.
In response, TPB and TPEC rely heavily on the rule stated in Angell v. Rowlands (1978) 85 Cal. App.3d 536, 540-542 [149 Cal. Rptr. 574], regarding *114 signatures to a contract, where the court adopted the approach of a particular line of cases, as set forth by the Supreme Court in Cavanaugh v. Casselman (1891) 88 Cal. 543 [26 P. 515]. That authority holds that a signer of a contract cannot escape liability unless he or she affirmatively establishes the parties contemplated the signatures of all parties were a condition precedent to the validity of the contract. In Angell, the Court of Appeal explained:
"We therefore decline to follow the Tewksbury [Tewksbury v. O'Connell (1862) 21 Cal. 60] line of cases insofar as they hold that an agreement is invariably incomplete until signed by all parties purportedly bound. Instead, we adopt the Cavanaugh line of cases, i.e., that a contract is invalid if not signed by all parties purportedly bound only when it is shown, either by parole or express condition, that the contract was not intended to be complete until all parties had signed. Conversely, in the absence of a showing that the contract is not intended to be complete until signed by all parties, the parties who did sign will be bound." (Angell v. Rowlands, supra, 85 Cal. App.3d 536, 542, original italics.)
Because TPEC never signed the letter of commitment, TPEC and TPB argue the letter is not an enforceable contract, and the record shows nothing more than an oral agreement to agree in the future on possible permanent financing arrangements. Thus, they contend the statute of limitations on such an oral contract (§ 339, two years) had already run before this action was filed, over three years after Peterson was told TPEC no longer made permanent financing arrangements. (5) They further claim the deposition excerpts from Eric Peterson's and Thor's testimony, admitting they did not know of conversations promising permanent financing, should control over Tracy's declaration to the contrary that was presented in opposition to the summary judgment motion, pursuant to the rule of D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 21-22 [112 Cal. Rptr. 786, 520 P.2d 10] (in general, admissions against interest in deposition testimony will control over contradictory statements in affidavits presented to oppose summary judgment proceedings).
Even assuming the trial court correctly concluded the statute of limitations (§ 339) barred any action for breach of an oral contract, the record and the issues presented on appeal require our discussion of the agreement in light of the rules applicable to written contracts. Thus, the dispositive issue presented is whether the letter of commitment represents a complete and fully enforceable contract. In making this determination, the letter of commitment and the construction loan agreement must be read together, consistent with the rule of Civil Code section 1642. We must inquire whether the parties intended to *115 be bound by this preliminary agreement to issue permanent financing. (Birdsong v. Welch (1960) 181 Cal. App.2d 749, 752 [5 Cal. Rptr. 474].)
(6) Letters of commitment, for which a fee is paid, constitute an option to the applicant to obtain the loan at the specified terms. (Lowe v. Massachusetts Mut. Life Ins. Co. (1976) 54 Cal. App.3d 718, 725-728 [127 Cal. Rptr. 23]; see 9 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 28.4, p. 9.) Under the usual principles of lender liability, "[a] loan commitment is not binding on the lender unless it contains all of the material terms of the loan, and either the lender's obligation is unconditional or the stated conditions have been satisfied. When the commitment does not contain all of the essential terms ... the prospective borrower cannot rely reasonably on the commitment, and the lender is not liable for either a breach of the contract or promissory estoppel." (9 Miller & Starr, op. cit. supra, § 28.4, at p. 8, fn. omitted.) The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment. (Op. cit. supra; see Laks v. Coast Fed. Sav. & Loan Assn. (1976) 60 Cal. App.3d 885, 891, 893 [131 Cal. Rptr. 836].)
We have examined the letter of commitment in an effort to identify all the required terms of this type of contract. They are not present. First, the identity of the potential borrower is not made clear; the letter contemplates offering financing either to Peterson or to its individual prospective home buyers in the project. Next, the amount of the loans is not specified; a blank appears where the letter requires specification that "the aggregate amount of all loans shall not exceed $ ____." It is also generally stated that the amount of the loan(s) "shall be up to 90% of Lender's appraisal or the purchase price, whichever is less." The terms of repayment of the loan(s) are nowhere specified in the letter, except that the lender's "standard interest rate quoted from time to time during the term hereof for comparable loans as of the date the loans are approved by Lender" shall be used. Similarly vague provisions are stated with regard to amortization and adjustable rate mortgages, while standard provisions are included concerning closing costs, insurance, and documentation.
These material contractual terms of the letter of commitment are so broadly defined that they do not appear to be capable of being made certain; on this record, no binding agreement could have been reached to supply permanent financing on mutually agreed-upon terms. Accordingly, even assuming the identity of TPEC as the permanent lender is established by reference to the construction loan agreement, the remainder of the contractual terms are inadequately defined. No enforceable contract to provide permanent financing is created by this document.
*116 Turning to an examination of Peterson's second cause of action for tortious breach of the implied covenant of good faith and fair dealing, it alleges TPB and TPEC denied the existence of the agreement to provide permanent financing and engaged in bad faith conduct depriving Peterson of its rights and benefits under its contractual agreements; punitive damages were sought. On appeal, Peterson argues this claim falls within the permissible parameters of such theory as established by Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 769 [206 Cal. Rptr. 354, 686 P.2d 1158]. (See discussion in Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal. App.3d 1371, 1391-1404 [272 Cal. Rptr. 387] and Price v. Wells Fargo Bank (1989) 213 Cal. App.3d 465, 478 [261 Cal. Rptr. 735].) (7) However, under Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 684 [254 Cal. Rptr. 211, 765 P.2d 373], this cause of action for breach of the implied covenant of good faith and fair dealing must now be considered to seek damages on a contract theory. An underlying contract is required to state such a cause of action or the related theory of bad faith denial of contract. (Careau & Co. v. Security Pacific Business Credit, Inc., supra, 222 Cal. App.3d at pp. 1393, 1401.) The same conclusions we reached above with reference to the claim for breach of contract thus apply. (See Copesky v. Superior Court (1991) 229 Cal. App.3d 678, 688-694 [280 Cal. Rptr. 338].) Accordingly, the trial court correctly granted the motion for summary judgment with respect to both of Peterson's contract theories of liability.

II

Escrow Theory of Liability
Peterson's theories of breach of fiduciary duty and constructive fraud are closely related. (8) It is essential to the operation of the doctrine of constructive fraud that there exist a fiduciary or special relationship. (Mary Pickford Co. v. Bayly Bros., Inc. (1939) 12 Cal.2d 501, 525 [86 P.2d 102]; Byrum v. Brand (1990) 219 Cal. App.3d 926, 937 [268 Cal. Rptr. 609]; Civil Code, § 1573.) Peterson claims TPB's activities as an escrow holder created such a fiduciary or special relationship, and alleges that breaches of duty and constructive fraud occurred when TPB failed to disclose all material facts regarding the loan transaction to Peterson. These nondisclosed "material facts" include the payment of $7,380 to TPEC for the loan commitment, and the failure of any TPEC representative to sign the letter of commitment.
As described above, the record shows TPB handled this construction loan transaction in-house by notarizing and recording loan documents, providing an escrow statement to Peterson, and disbursing loan proceeds. After the *117 foreclosure on the property took place and this action was brought, Peterson raised the possibility of a fiduciary theory of liability. However, the amended complaint does not plead any specific facts about the escrow function, instead merely generally alleging TPB's breach of an unspecified fiduciary duty to disclose all material facts regarding the funding of the loan and the letter of commitment. Peterson's opposition to the motion for summary judgment makes reference to the escrow statement received from TPB in connection with Peterson's claim that TPB made an inadequate disclosure of the loan documents. (9) (See fn. 11.) It was not until the opening brief on appeal was filed that the escrow theory of liability was specifically argued.[11]
Because this record raises substantial questions about the scope of duty undertaken by TPB in this transaction, we have obtained supplemental briefing from the parties on the question of whether the provision of this type of services resulted in TPB's assumption of particular duties that are fiduciary in nature and that removed this transaction from the usual "armslength" borrower/creditor commercial context. (See Mitsui Manufacturers Bank v. Superior Court (1989) 212 Cal. App.3d 726, 731 [260 Cal. Rptr. 793].) We must decide if TPB removed itself in this transaction from established limitations on the obligations incurred in "normal commercial banking transactions." (Id. at p. 729.)
It is not uncommon for a lending institution to handle escrow functions. (See 2 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 5.1, p. 395.) When banks and similar institutions perform such duties, they are entitled to be exempted from the coverage of Financial Code section 17000 et seq., the law regulating escrow matters such as licensing, bonding, crimes and civil penalties. (Fin. Code, § 17006.)
(10a) Generally, the performance of the escrow function is governed by the following common law principles:
"An escrow holder is the limited agent and fiduciary of all parties to an escrow. [Citations.] The agency is limited because the escrow agent only represents his principals insofar as he carries out the escrow instructions. [Citation.] ... [¶] An escrow holder has a fiduciary duty `to communicate *118 to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction, particularly where ... he knows that the principal is looking to him for protection as to those very facts of which he has knowledge.' [Citations.] A breach of this fiduciary duty or the failure to exercise reasonable skill and diligence in carrying out the escrow instructions subjects the escrow holder to liability. [Citation.] Likewise, the escrow agent is liable for any loss caused by his failure to strictly comply with his principal's instructions or by his disposal of escrow property in violation of those instructions. [Citation.]" (Kirby v. Palos Verdes Escrow Co. (1986) 183 Cal. App.3d 57, 64-65 [227 Cal. Rptr. 785].)
To decide whether these rules should be applied to evaluate TPB's conduct in this case, we look to the definition and purpose of the escrow function. (11) An escrow may be defined as "a transaction in which one person, for the purpose of effecting a sale, transfer or incumbrance of real or personal property to another person, delivers any written instrument, money, evidence of title or other thing of value to a third party, the escrow holder or depository, to be held by him for ultimate transmittal to the other person upon the happening of an event or the performance of certain specified conditions." (Lee v. Title Ins. & Trust Co. (1968) 264 Cal. App.2d 160, 162 [70 Cal. Rptr. 378].) "The usual purpose that prompts the creation of an escrow is the desire of persons dealing at arm's-length with each other to have their conflicting interests handled by one person in such a manner as to adequately protect the rights of each of the parties to the transaction." (Blackburn v. McCoy (1934) 1 Cal. App.2d 648, 654 [37 P.2d 153].) (10b) To protect the interests of the parties, an escrow agent who has an interest in the transaction is obligated to disclose that interest before accepting employment as an agent for the parties to the transaction. (McFate v. Bank of America of California (1932) 125 Cal. App. 683, 687 [14 P.2d 146]; also see Becker v. Buman (1986) 239 Kan. 342 [721 P.2d 246, 250].)
In order to guarantee the proper performance of escrow duties, it is the general rule that an escrow agent should not be a party to the escrowed transaction. (Roberts v. Carter & Potruch (1956) 140 Cal. App.2d 370, 373 [295 P.2d 515]; 2 Miller & Starr, op. cit. supra, § 5.2, at p. 398.) It has been held, however, that a bank which acted as an escrow holder did not violate any escrow duties by purchasing the escrowed property, subject to the conditions on which the property was held in escrow, as long as there was nothing in the agreements of the parties preventing the sale of the property to anyone in particular (such as the escrow holder). (Portuguese American Bk. v. Schultz (1920) 49 Cal. App. 508, 512 [193 P. 806]; also see Gurley v. Bank of Huntsville (1977 Ala.) 349 So.2d 43, 45-46.)
*119 (12) According to a leading real estate treatise, the general rule is "a lender does not assume any obligations regarding the viability of the project or investment which is financed by the loan funds as long as the conduct of the lender is limited to the activities which customarily are associated with the lending function." (4 Miller & Starr, op. cit. supra, § 9.61, p. 176.) This court has recognized in Copesky v. Superior Court, supra, 229 Cal. App.3d 678, 691, footnote 12, that in some cases, a bank may under special circumstances "undertake obligations which bring it into a `special relationship' with a customer." Such circumstances include a bank's provision of trust and other specifically fiduciary services. (Ibid.; see 9 Miller & Starr, op. cit. supra, § 28.9, at p. 30.) Such special circumstances must be distinguished from the usual bank-depositor or bank-borrower relationship. (Copesky v. Superior Court, supra, 229 Cal. App.3d at p. 691, fn. 12.) In Copesky, with respect to the normal commercial banking context, we cautioned against the "loose characterization" (id. at p. 693, fn. 14) of financial relationships as "fiduciary, quasi-fiduciary or fiduciary like" (ibid.), commenting that with respect to ordinary banking transactions, "the bank is in no sense a true fiduciary." (Ibid.)
With these principles in mind, we have examined the record showing the relationship between Peterson and TPB. TPB was involved from the inception of this transaction as the lender from whom Peterson sought the construction financing; similarly, Peterson was made aware of TPEC's involvement on the face of the documents. Peterson was also aware that TPB handled the processing of the loan and presented the papers to Peterson for signature. These facts are consistent with only one conclusion: at the time of the transaction, the relationship between borrower and lender fell into the usual category of an arm's-length, adverse, "normal commercial banking transaction[]." (Mitsui Manufacturers Bank v. Superior Court, supra, 212 Cal. App.3d at p. 729.) Despite the receipt of an "escrow statement" from TPB and Peterson's awareness TPB processed all loan papers, there are no triable issues as to whether Peterson reasonably reposed particular trust and confidence in TPB as a fiduciary, or whether TPB accepted such particular reliance. No third party was ever involved in this transaction, nor did TPB hold itself out to be a neutral, objective, disinterested conduit for the parties' exchange of documents and money. There could have been no reasonable reliance on any such representations that were never made. Consequently, we conclude Peterson's claimed reliance on TPB's loan processing procedures provides it no basis to claim a "relaxed duty" to inquire into TPB's conduct during and after the term of the loan. (Lee v. Escrow Consultants, Inc. (1989) 210 Cal. App.3d 915, 921 [259 Cal. Rptr. 117].)
Moreover, absent any fiduciary duty undertaken by TPB, we find no duty on its part to disclose the internal breakdown of the loan fees charged. *120 Peterson received the escrow statement listing loan fees of $12,300; Peterson testified that amount of expense was appropriate for this type of project. That TPB allocated some of this amount to TPEC and some to itself does not create a fiduciary theory where none is otherwise shown to exist.
(13) Finally, Peterson has shown no basis to claim any justified "delayed discovery" of the alleged constructive fraud, which would toll the statute of limitations for a fraud action. (§ 338; Lee v. Escrow Consultants, Inc., supra, 210 Cal. App.3d 915, 921.) This complaint was filed in October 1988, more than three years after Thor was told in the summer of 1985 there would be no permanent financing from TPB or TPEC. Since Peterson was placed on notice of the denial, which it now claims was concealed from it, the claim for constructive fraud is on its face time-barred. No amendment, such as Peterson now requests to be allowed (to change its fraud theories), is supported by the record or would be proper at this time. The trial court correctly concluded no triable issues remained on the fiduciary duty theory of recovery.

III[*]

Attorney's Fees
.... .... .... .... .... .... .... .

DISPOSITION
The judgment and order are affirmed, and the writ of supersedeas is discharged as of the date of the issuance of the remittitur. The requests for sanctions for a frivolous appeal and for an inadequate provision of the appellate record are denied. TPB and TPEC shall be allowed their attorney's fees on appeal in an amount to be determined by the superior court on filing of a cost bill.
Froehlich, J., concurred.
NARES, J.
I concur in the result, based upon my agreement with the analysis in parts I and III of the discussion. On this record I would decline to reach the issues presented in part II of the discussion (see maj. opn., fn. 11, ante, p. 117) and express no views thereon.
Appellants' petition for review by the Supreme Court was denied November 14, 1991. Mosk, J., was of the opinion that the petition should be granted.
NOTES
[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.
[2] The other loan documents Eric Peterson signed included the promissory note and deed of trust, a personal guaranty, loan disbursement instructions, and completion and release price agreements. Tracy, in her capacity as Peterson's chief financial officer, signed a corporate borrowing resolution.
[3] Although Peterson signed the letter of commitment, neither TPEC, which drafted the letter, nor TPB did so. No copy of this letter was returned to Peterson along with the other loan documents. Peterson did not get a copy of the letter or learn that no representative of TPEC, such as Strangman, had ever signed it until it was produced in discovery some years later in connection with a related action against Westwind Mortgage Company, as will be explained post.
[4] At deposition, Strangman testified he did not write "Not utilized" on the document and did not know who did.
[5] At her deposition, TPB's loan processor Beagle stated she couldn't tell if the word "commitment" was stricken out or underlined on the document.
[6] The complaint was first filed in the North County branch of the superior court in October 1988 and was dismissed and promptly refiled by stipulation. The complaint was amended once after a demurrer was sustained.
[7] All statutory references are to the Code of Civil Procedure unless otherwise specified.
[8] In their respondents' brief, TPB and TPEC have sought an award of sanctions and attorney's fees against Peterson on several bases: inadequate record under California Rules of Court, rule 5.1(i) (all further rule citations are to these rules); frivolous appeal (§ 907; rule 26(a)); and a further award of attorney's fees pursuant to Civil Code section 1717 (see pt. III, post, for discussion of all attorney's fees issues). In reply, Peterson requests similar sanctions, claiming the deposition excerpts supplied by respondents to supplement the "incomplete" appellant's appendix were themselves incomplete.

Despite this dispute, neither party has supplied to this court the complete deposition transcripts that were lodged with the trial court for the hearing on the summary judgment motion, as would have been permitted by rule 5(e). In any case, the judge who heard the summary judgment and reconsideration motions noted on the record at reconsideration that he relied on the facts as presented in a nondeposition form, analyzing the issues in this way: "I just got back to the position that we have an oral contract, in my opinion, as a matter of law, evidenced by a series of documents, and that's a problem for [Peterson]." In light of the foregoing, we deem the record jointly presented by the parties to be adequate for analysis of the issues presented and decline to award any sanctions for an inadequate record, as requested.
We also decline to award sanctions for a frivolous appeal. The issues presented are complex and challenging and it is not possible to say these appeals are frivolous or taken solely for purposes of delay. (§ 907; rule 26(a); In re Marriage of Flaherty (1982) 31 Cal.3d 637, 649-650 [183 Cal. Rptr. 508, 646 P.2d 179].)
[9] Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."
[10] Civil Code section 1621 provides: "An implied contract is one, the existence and terms of which are manifested by conduct."
[11] Even though the escrow theory of liability was not a focus of the summary judgment proceedings, we have deemed it necessary to address this question in full. An appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal. (Richmond v. Dart Industries, Inc. (1987) 196 Cal. App.3d 869, 879 [242 Cal. Rptr. 184].) Here, the fiduciary theory is generally set forth in the amended complaint and the record contains undisputed evidence about the provision of loan processing services such as are commonly provided by escrow holders.
[*] See footnote 1, ante, page 103.