Filed 2/23/26  Schuman v. Citibank CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| STEVEN A. SCHUMAN, Plaintiff and Appellant, v. CITIBANK, N.A. et al., Defendants and Respondents. | B343274 (Los Angeles County Super. Ct. No. 23STCV18993) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed.

iGeneral Counsel, Wendy Evelyn Giberti; Leonard, Dicker & Schreiber, Richard C. Leonard and Steven A. Schuman for Plaintiff and Appellant.

Bryan Cave Leighton Paisner, Adam A. Vukovic and Emily Yu for Defendants and Respondents.

_____

Plaintiff Steven A. Schuman sought a cash-out refinance loan for his residence. Citibank, N.A. (Citibank) communicated that it was willing to provide a 30-year, $1.5 million loan at an interest rate of less than 4 percent with a cash out component subject to Schuman meeting certain terms and conditions. Prior to the closing date, Citibank disclosed to Schuman that the amount of cash he could expect at closing would be significantly less than the initial estimate, as Citibank would require that a portion of the loan proceeds be used to pay off three other outstanding loans. Schuman refused to close on those terms and sued Citibank for breach of contract, fraud, and promissory estoppel.

After sustaining two demurrers with leave to amend, the trial court sustained Citibank's demurrer to Schuman's verified second amended complaint (the SAC) without leave to amend. The court concluded the exhibits to the SAC, including Citibank's conditional loan approval and a mortgage loan commitment, were too indefinite to constitute an enforceable contract or to support a claim for promissory estoppel. The court further found Schuman failed to state a claim for fraud.

Schuman argues he sufficiently alleged each claim. We conclude the trial court did not err and affirm.

## FACTUAL AND PROCEDRAL BACKGROUND

### A.     The Operative Complaint

#### 1.     *Factual Summary*

As this matter comes to us at the demurrer stage, we accept as true the well-pleaded factual allegations in the SAC but not any of its asserted conclusions of fact or law. (*Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92

Cal.App.5th 230, 264.) If facts appearing in exhibits attached to the complaint are inconsistent with the complaint's allegations, we accept as true the contents of the exhibits. (*Genis v. Schainbaum* (2021) 66 Cal.App.5th 1007, 1014-1015.)

The SAC alleged that Schuman owned and lived in a house in Beverly Hills (the Beverly Property). The Beverly Property had an existing mortgage loan whose interest rate would become variable in February 2023. On March 16, 2022, he sought a loan from Citibank to purchase a new home in Nipomo, California (the Nipomo Property). A loan broker referred Schuman to Citibank loan officer Jesse Nathan Tyre-Karp to assist with a purchase money loan for the Nipomo Property, and also to help Schuman refinance the existing mortgage on the Beverly Property via a $1.5 million loan at a 30-year fixed interest rate of 3.375 percent.

In a March 16, 2022 email, Tyre-Karp requested that Schuman provide several documents, including tax returns, personal and business bank statements, mortgage statements for each property Schuman owned, and a fully executed purchase contract for the Nipomo Property.

Two weeks later, Schuman advised Citibank that the Nipomo Property purchase "fell through" but that he was "still very interested in the refi[nance loan]" for the Beverly Property. The SAC alleged the "cash out of nearly $1,000,000 [from the loan] would provide Schuman with much[ ]needed cash," but did not indicate how he learned he could expect this amount of cash from the loan. The SAC also alleged "Schuman informed Tyre-Karp that the cash could be used as part of the down payment on a new home, to repair the Beverly Property before leasing it, and to repair and upgrade the new home. In addition, any excess cash could always be used to pay down Schuman's various loans

3

on investment properties." There is no allegation that Citibank or Tyre-Karp agreed the loan proceeds would be applied in the manner that Schuman desired.

In an April 20, 2022 letter, Citibank notified Schuman his loan had been "conditionally approved." The letter described the loan as a refinance loan for the Beverly Property in the amount of $1.5 million, for 30 years, with a fixed interest rate of 3.375 percent. The letter stated, "You will receive final loan approval once the conditions listed on the enclosed [b]orrower's [c]hecklist have been met, provided you maintain your continued credit worthiness, and can provide acceptable collateral for the mortgage loan." (Boldface and underscoring omitted.)

The borrower checklist set forth 14 items, including that Schuman was to deposit at least $50,000 in a Citibank account prior to closing to obtain an interest rate reduction (i.e., a condition precedent to obtaining favorable loan terms). Item 7 on the checklist stated, "Approval is subject to [l]ender verification of the maximum [l]oan to [v]alue which will be determined at the time of full loan approval." The checklist also required Schuman to provide loan statements relating to a home equity line of credit (HELOC) from First Citizens Bank and information relating to three other properties, including "the initial approval letter for the refinance loan currently tied with" one of the properties. The items concerning the HELOC and three properties each stated, "***Additional [c]onditions may apply.***" Neither the conditional approval nor the borrower checklist stated the amount of cash to borrower that Schuman could expect at closing.

Tyre-Karp told Schuman that if he deposited $200,000 or $500,000 into a Citibank account, the interest rate would decrease to 3.25 or 3.125 percent, respectively. Relying on the

4

conditional loan approval, Schuman deposited over $500,000 into two Citibank accounts.

On May 4, 2022, Tyre-Karp emailed Schuman, "Final loan approval is done. Congrats!"

On May 5, 2022, Citibank issued a mortgage loan commitment (the commitment) to Schuman. The SAC alleged that the commitment "contained no conditions precedent to the formation of a final contract," "contain[ed] all the terms necessary to form a fully binding contract," and required only evidence of title. The SAC further alleged, "As of May 5, 2022, Citibank agreed unconditionally to fund [the l]oan and the parties had reached a full and final agreement." "Citibank had never imposed any condition with regards to the use of the proceeds of the loan."

The commitment stated Schuman's application for a "loan has been approved subject to the terms and conditions set forth in this commitment letter" and that the loan must close and fund prior to May 20, 2022, when the locked interest rate would expire. It further stated, "The [l]ender reserve[d] the right to terminate this commitment prior to the settlement of the loan in the event of an adverse change in your personal or financial status."

The commitment included two pages of terms and conditions and attached another borrower's checklist that included six items. The checklist stated the items were required "to complete the processing of [Schuman's] real estate loan application" and that Citibank "reserve[d] the right to cancel any conditional approval" if the documents and information were not received by May 12, 2022. The items included tax information for both Schuman and his limited liability company as well as real

estate tax information.  The checklist explained that any delinquent real estate taxes might require "possible requalification for the loan."  Neither the commitment nor the attached checklist represented that Schuman would receive nearly $1 million cash out (or any other specific amount) from the loan.

On May 6, 2022, Citibank provided Schuman with a closing disclosure, which stated, "This form is a statement of final loan terms and closing costs."  (Italics omitted.)  The cover letter stated that the disclosure was being provided to him to give him "the opportunity to review [the terms] prior to [his] closing date," which was scheduled for May 10, 2022.  The closing disclosure listed the loan terms, projected payment details, closing costs, and that $1,430,634.60 from the Citibank loan would need to be used to pay off three other loans.  The disclosure included a chart indicating that at the time of the "loan estimate," Citibank had estimated Schuman would receive $953,688 in cash, but the final amount of cash to him at the time of closing would be $62,795.16.  The disclosure explained this difference was due to payments and payoffs of three other loans.[1]

The SAC alleged, "The refinance, as promised, would have given Schuman over $950,000 [in] cash at a fixed rate."  The closing disclosure "contained new and materially different terms, namely" that the cash to Schuman had changed since the time of his loan estimate.  The difference was because Citibank proposed to pay "two unrelated loans on investment properties in Seattle,"

---

[1] The closing disclosure lists First Citizens Bank as a fourth item under "[p]ayoffs and [p]ayments," but does not list any payoff amount.

but Citibank had never conditioned the loan on the payment of these other loans.

The SAC alleged that before Citibank provided Schuman with the closing disclosure, Citibank had closed his existing $600,000 HELOC with First Citizens Bank. "Schuman knew . . . that the HELOC would be closed when the loan from Citibank closed," but he did not agree that Citibank could close the HELOC without making the loan.

The SAC alleged that Schuman refused to close on the terms set forth in the closing disclosure, and that as a result Tyre-Karp stated the loan needed to be resubmitted to underwriting.

In a May 18, 2022 email attached to the SAC, Tyre-Karp stated, "Your intended purchase of the new home [in] . . . Aroyyo [*sic*] Grande . . . as your principal residence changes the intended occupancy of the [Beverly Property], and may impact your liabilities, assets, and credit as well as the Citi[bank] loan products available to you. This is new information that wasn't previously available to our credit team at the time Citi[bank] issued its loan commitment to you, so it was necessary for them to re-review your application." The SAC alleged that Tyre-Karp and Citibank, "had known from the very first day that Schuman was intending to move from the Beverly Property" and used the fact he was going to buy a new home "as an excuse to back out of the . . . [c]ommitment."

In a May 26, 2022 document entitled "Statement of Credit Denial, Termination or Change" attached to the SAC, Citibank explained the principal reasons it could not approve a loan on Schuman's requested terms were that he requested excessive cash back from the loan or to finance costs that may not be paid

7

by the loan proceeds, had insufficient income for total obligations, owned or financed more properties than the allowed maximum, and that Citibank was "[u]nable to verify residence or occupancy." The SAC alleged these reasons were "patently false and/or . . . are facts Citibank knew all along."

2. *Schuman's Claims*

The SAC asserted causes of action for (1) breach of contract against Citibank, (2) fraud against Citibank and Tyre-Karp, and (3) promissory estoppel against Citibank.

The cause of action for breach of contract alleged that Citibank agreed to make the refinancing loan on the terms set forth in the April 20, 2022 letter conditionally approving the loan, in the commitment, and as described in the factual recitation of the SAC. The cause of action does not state how Citibank breached the agreement or refer to the amount of cash Schuman expected to receive from the Citibank loan. Citibank's actions allegedly damaged Schuman because he "lost the ability to refinance the Beverly Property while it was still his primary residence." At the time Schuman filed the SAC, no lender offered a loan on similar terms, and the best interest rate available was approximately 7.25 percent. The SAC prayed for specific performance of "the loan on the terms promised" or damages of nearly $1.4 million.

The cause of action for fraud against Citibank and Tyre-Karp alleged the defendants "repeatedly" told Schuman that he would receive nearly $1 million in cash when the loan closed, but the defendants did not intend to give this much cash to Schuman or disclose that Citibank would use the loan proceeds to pay Schuman's unrelated loans. The "[d]efendants . . . materially lied about the cash at closing to induce [Schuman] to close on the

8

[l]oan and forego other lenders." Schuman "did forgo other lenders and was induced into acceptance and performance on the contract," including depositing $500,000 into a Citibank account. The "[d]efendants knew [Schuman's] locked rate expired on May 20, 2022, just two weeks after Citibank switched the [l]oan terms, leaving Schuman no time to obtain other financing." The defendants engaged in a " 'bait and switch' " that rendered the loan of little value to Schuman and closed Schuman's HELOC to further pressure him to accept the new loan terms. Schuman sought fraud damages in excess of $1 million and punitive damages for the defendants' "willful breach of fiduciary duty."

The cause of action for promissory estoppel alleged "Citibank made a clear and unambiguous written promise to loan [Schuman] $1[.5 million] at a fixed [interest] rate of 3.375[ percent] with a [30]-year term." Schuman claims he relied on Citibank to make the loan, spending over 30 hours gathering documents and communicating with Citibank, foregoing pursuing other loans, depositing over $500,000 into a Citibank account, and paying for an appraisal. Schuman was damaged as a different loan would require him to pay interest of at least 7.25 percent.

## B.     Demurrer

### 1.     *The Defendants' Demurrer*

Citibank and Tyre-Karp demurred to the SAC. They argued that Schuman failed to allege the existence of a contract because the commitment was conditional and the alleged contractual terms uncertain. They further argued that the statute of frauds barred the alleged contract and that Schuman failed to allege damages caused by Citibank. Schuman could not state a claim for promissory estoppel because there was no

9

" 'clear and unambiguous' " promise. The defendants argued the economic loss doctrine barred the fraud claim, the SAC failed to plead any misrepresentation with the required particularity, and the SAC could not allege reliance or identify causation or damages.

The defendants also argued that the court should not permit Schuman to amend his complaint because he had already twice done so and failed to state a claim. In Schuman's original complaint and later in his first amended complaint, Schuman alleged claims for breach of contract, professional negligence or fraud, and promissory estoppel. In each instance, the trial court found the exhibits to the then-operative complaint conflicted with Schuman's allegations that a contract existed and, thus, sustained the defendants' demurrers with leave to amend.

### 2. *Schuman's Opposition*

In opposition, Schuman argued that Tyre-Karp and Citibank knew that Schuman wanted to refinance the Beverly Property and use nearly $1 million cash out from that refinance to purchase a new home. The defendants "attempted to alter the terms of a valid and enforceable loan agreement, which Schuman refused to amend." He argued that as of April 22, 2022, the only condition that remained for Citibank to issue the loan was for Schuman to deposit money into a Citibank account. After he did so, Tyre-Karp congratulated Schuman that "[f]inal loan approval [wa]s done." The commitment confirmed that Citibank would lend Schuman $1.5 million at a fixed interest rate of 3.125 percent, for 30 years. Schuman argued that the commitment contained only additional terms of performance, not conditions precedent to Citibank's promise to fund the loan. Schuman further argued that because he deposited $500,000 and Citibank

10

closed his HELOC, the parties partially performed and, thus, the statute of frauds did not apply.

As to fraud, Schuman argued the economic loss doctrine did not apply and that he pleaded the cause of action with the requisite specificity.

Schuman did not request further leave to amend if the court was inclined to sustain the demurrer.

### 3. *The Defendants' Reply*

In reply, the defendants argued that the exhibits to the SAC demonstrated that Citibank issued only a conditional approval and commitment, and the parties never reached a final, binding loan agreement. Further, Schuman could not have been fraudulently induced into a loan agreement because there was no agreement.

### 4. *The Trial Court's Ruling*

On December 11, 2024, the trial court sustained the demurrer without leave to amend. It found that "the exhibits attached to the SAC evidence a series of negotiations and 'agreements to agree.'" The commitment "only indicat[ed] that [Schuman]'s loan application was approved and that such approval was subject to further conditions." That a contract had not been formed was further supported by Schuman's allegation that he refused to close on the terms stated in the closing disclosure. The court also found that Schuman could not maintain a cause of action that the defendants fraudulently induced him to enter into a contract because the parties did not enter into any binding agreement. The court further found there was not a clear and unambiguous offer sufficient to support a

11

promissory estoppel claim.  The court later entered judgment for the defendants.[2]

## DISCUSSION

### A.    Standard of Review

" 'We independently review [a] ruling on a demurrer and determine de novo whether the pleading alleges facts sufficient to state a cause of action.' [Citation.]  '[W]e accept as true the well-pleaded allegations in [the] . . . complaint.  " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " ' " (*Los Angeles Waterkeeper v. State Water Resources Control Bd.*, *supra*, 92 Cal.App.5th at p. 264.)  "[C]ourts will not close their eyes in situations where a complaint contains allegations of fact inconsistent with attached documents/exhibits, or allegations contrary to facts which are judicially noticed.  [Citation.]  Where facts appearing in attached exhibits or judicially noticed documents contradict, or are inconsistent with, the complaint's allegations, we must rely on the facts in the exhibits and judicially noticed documents." (*Genis v. Schainbaum*, *supra*, 66 Cal.App.5th at p. 1015.)  The plaintiff bears the burden of demonstrating that the trial court erroneously sustained the

---

[2] Schuman filed a notice of appeal from the trial court's order sustaining the demurrer.  We dismissed the appeal due to Schuman's failure to provide an appealable judgment or order.  On February 20, 2025, the trial court entered judgment, and after Schuman provided the judgment to this court, we vacated the dismissal.  We treat Schuman's premature notice of appeal as filed immediately after the entry of judgment, and therefore valid.  (*Boyer v. Jensen* (2005) 129 Cal.App.4th 62, 69; Cal. Rules of Court, rule 8.104(d)(2).)

12

demurrer as a matter of law.  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)  We may affirm a trial court's ruling sustaining a demurrer if correct on any theory.  (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15-16.)

## B.    Breach of Contract

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.'  (Civ. Code, § 1580; see also §§ 1550, 1565.)  'If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation.'  [Citation.]  'Mutual consent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.'  [Citations.]  [¶]  Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed.  But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide."  (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.)

" 'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.'  [Citation.]  'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.'  [Citations.]  'Where a contract is so

13

uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.' [Citations.] 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.' [Citations.] But '[i]f . . . a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.' " (*Bustamante v. Intuit, Inc.*, *supra*, 141 Cal.App.4th at p. 209.)

Consistent with these principles, "[a] loan commitment is not binding on the lender unless it contains all of the material terms of the loan, and either the lender's obligation is unconditional or the stated conditions have been satisfied. [¶] When the commitment does not contain all of the essential terms, . . . the prospective borrower cannot reasonably rely on the commitment, and the lender is not liable for either a breach of contract or promissory estoppel." (11 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 35.9, fns. omitted; see *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115 [holding a letter of commitment's terms were uncertain and no binding agreement existed].) "The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment." (*Peterson Development Co. v. Torrey Pines Bank*, *supra*, at p. 115; see also *Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 891 [describing important terms missing from the commitment to include the "payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculations, loan

disbursement procedures, and rights and remedies of the parties in case of default," and affirming the trial court's ruling sustaining a demurrer to the plaintiff's promissory estoppel claim].)

Schuman argues that the April 20, 2022 conditional loan approval letter became an enforceable contract when he, by May 3, 2022, performed 14 conditions precedent listed on the borrower's checklist. He argues in the alternative that the loan agreement became binding when Citibank issued the commitment on May 5, 2022.

The April 20, 2022 conditional loan approval letter did not create a binding obligation on Citibank to provide a loan to Schuman. Nor did Schuman's alleged compliance with the 14 items listed on the borrower's checklist by May 3, 2022 create a binding contract. Both the letter and the checklist stated that the approval was conditional and that Citibank was requesting further financial information from Schuman, which it would then need to evaluate and ensure he "maintain[ed] [his] continued credit worthiness, and [could] provide acceptable collateral for the mortgage loan." Item 7 of 14 on the checklist stated, "Approval is subject to [l]ender verification of the maximum [l]oan to [v]alue which will be determined at the time of full loan approval." In other words, the borrower's checklist advised Schuman that Citibank was continuing to conduct its due diligence before any final approval of the loan application. Additionally, Citibank requested information for three other properties owned by Schuman and noted that "[a]dditional conditions may apply" upon receipt of that information. Thus, the only conclusion one can draw from the April 20, 2022 letter and checklist was that Citibank had not yet made a binding

15

commitment to fund the loan, nor would it until it had an opportunity to evaluate the additional information Schuman submitted.  The terms to which Citibank would ultimately agree—including the amount of cash to borrower, a term not even stated in the conditional approval—were uncertain.

The May 5, 2022 mortgage loan commitment reinforces the tentative and, thus, nonbinding nature of the parties' back and forth.  It explained Citibank "reserve[d] the right to terminate [the] commitment prior to the settlement of the loan in the event of an adverse change in [Schuman's] personal or financial status" and "reserve[d] the right to cancel any *conditional* approval" if it did not receive the requested information on time.  (Italics added.)  It stated Schuman's loan application "has been approved subject to the terms and conditions set forth in this commitment letter."  The attached checklist stated the items were required "to complete the processing of [Schuman's] real estate loan application," indicating that activity had not yet concluded and Citibank's evaluation continued.  The checklist included that if there were delinquent real estate taxes, "possible requalification for the loan" may be required, again emphasizing the nonfinal nature of the commitment.

The SAC alleged the commitment "contained no conditions precedent to the formation of the final contract."  On appeal, Schuman abandons that inaccurate characterization and admits conditions precedent remained in the commitment, but argues those conditions were "inconsequential" and could have been performed at closing.  He argues any claim that there was a change in his personal or financial status was "patently false" or involved facts known by Citibank all along.  He further argues that Citibank closing his HELOC and his deposit of $500,000 into

16

a Citibank account demonstrated that a binding agreement had been formed pursuant to which the parties had partially performed.

We do not agree that any remaining conditions precedent in the commitment were inconsequential, or already known to Citibank and satisfied, such that Schuman stated a breach of contract claim. As stated above, a lender's commitment may be binding if it contains all the material terms of the loan, and either the lender's obligation is unconditional or the stated conditions have been satisfied. (*Peterson Development Co. v. Torrey Pines Bank*, *supra*, 233 Cal.App.3d at p. 115.) In determining whether a term is material, " 'the question is whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly . . . makes it also unfair to enforce the remainder of the agreement. The more important the subject matter to be agreed upon, the more likely it is that the uncertainty will prevent or hinder enforcement. If the contract cannot be performed without settlement of the undetermined point . . . the entire contract may fail.' " (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 813.)

Here, the amount of cash in hand to the borrower was an essential term of the loan; indeed, Schuman argues it was "the most material term." Citibank's closing disclosure offered a $1.5 million loan, with an interest rate of 3.125 percent, fixed for 30 years—the very terms Schuman alleges in the SAC that Citibank promised to him—and he rejected it because it "contained new and materially different terms, namely" that the cash to borrower had changed since the time of his loan estimate. However, neither the conditional approval nor the commitment

17

stated how much cash to borrower Schuman could expect at the time of closing and, thus, neither reflected a sufficiently definite and enforceable contract. (*Bustamante v. Intuit, Inc., supra*, 141 Cal.App.4th at p. 209; *Peterson Development Co. v. Torrey Pines Bank, supra*, 233 Cal.App.3d at p. 115; *Laks v. Coast Fed. Sav. & Loan Assn., supra*, 60 Cal.App.3d at p. 891.)

We further reject Schuman's claim that his deposit of $500,000 into a Citibank account and the closure of his HELOC constituted partial performance under an enforceable contract. As just stated, there was no enforceable contract. These acts were simply the performance of some of the conditions precedent required prior to the formation of any contract. The deposit of monies was required before closing as a condition of Citibank agreeing to a lower interest rate and the HELOC needed to be closed before or at the time of closing to ensure Citibank's first lien position on the property.

## C.  Fraud

The elements of fraud are (1) misrepresentation, (2) knowledge of falsity, (3) intent to defraud, i.e., to induce reliance, (4) justifiable reliance, and (5) resulting damage. (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 32.) "Fraud must be pleaded with specificity, to provide the defendants with the fullest possible details of the charge so they are able to prepare a defense to this serious attack. To withstand a demurrer, the *facts* constituting every element of the fraud must be alleged with particularity . . . . [Citation.] Even in a case involving numerous oft-repeated misrepresentations, the plaintiff must, at a minimum, set out a representative selection of the alleged misrepresentations sufficient to permit the trial court to ascertain whether the statements were material and otherwise

18

actionable." (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782-783.) " 'This particularity requirement necessitates pleading facts which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645, italics omitted.)

Schuman argues that he pleaded fraud with the requisite specificity. However, as to the misrepresentation element, the SAC only alleged, "[The d]efendants repeatedly and intentionally lied to [Schuman] regarding the amount of cash, almost $1 [million that] he would receive when the loan closed."[3] There are no allegations indicating how, when, or by what means the misrepresentations were tendered, such that they are insufficient to ascertain whether a claim has been stated. (*Lazar v. Superior Court*, *supra*, 12 Cal.4th at p. 645.)

The closing disclosure indicates only a single instance whereby Citibank represented that the cash to Schuman would be almost $1 million, and that was at the time of the loan estimate. However, the loan estimate was provided early in the loan process and, by its terms, was only an estimate, subject to

---

[3] The SAC also alleged the defendants falsely represented that Schuman would not have to continue to live in the Beverly Property as a condition of the loan. Schuman does not discuss this portion of his fraud claim on appeal and, thus, we consider any argument relating to that alleged misrepresentation to be forfeited. (*Hurley v. Department of Parks & Recreation* (2018) 20 Cal.App.5th 634, 648, fn. 10.)

change.[4]  As a matter of law, Schuman could not justifiably rely on the loan estimate as a promise of the amount of cash he would receive.

## D.    Promissory Estoppel

" '[A] promise is an indispensable element of the doctrine of promissory estoppel.  The cases are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice . . . .' [Citation.] The promise must, in addition, be 'clear and unambiguous in its terms.' [Citation.]  'Estoppel cannot be established from . . . preliminary discussions and negotiations.' " (*Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1044.)[5]

---

[4] The Truth in Lending Act (15 U.S.C. § 1601 et seq.) requires creditors to provide a loan estimate to a consumer no later than the third business day after the creditor receives the consumer's application.  (12 C.F.R. § 1026.19(e)(1)(iii)(A).)  "[A]n application consists of the submission of the consumer's name, the consumer's income, the consumer's social security number to obtain a credit report, the property address, an estimate of the value of the property, and the mortgage loan amount sought." (12 C.F.R. § 1026.2(a)(3)(ii).)  Schuman does not allege that Citibank failed to comply with lending laws.  Federal law also acknowledges that the amount of cash to the borrower (also called "cash to close") may change between the loan estimate and the closing disclosures and therefore mandates that the creditor identify the different amounts on the closing disclosure.  (12 C.F.R. § 1026.38(e)(5).)

[5] The elements of a promissory estoppel claim are: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both

20

Consistent with the SAC's allegations, Schuman argues, "Citibank made a clear and unambiguous written promise to loan Schuman $1[.5 million] at a fixed [interest] rate of 3.375[ percent] with a [30]-year term." As discussed above, however, Citibank's commitment was conditional and not a clear promise on which a prospective borrower could reasonably rely.

Even if we assume Citibank made such a promise, Schuman's promissory estoppel claim fails because the amount of cash out was not part of the specified promise. As evidenced by the closing disclosure, Citibank acted in accordance with its purported promise, offering Schuman a $1.5 million refinance loan at an even better interest rate of 3.125 percent fixed for 30 years. Thus, Citibank did not fail to fulfill any such promise. Rather, Schuman chose to reject that loan because he would not receive approximately $1 million in cash from the loan as he had hoped. Neither Schuman's claim for promissory estoppel nor his arguments on appeal concerning that claim assert that Citibank made a clear and unambiguous promise to give him around $1 million in cash. We therefore treat any such argument as forfeited. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived" ' "].)

## E.    Denial of Leave to Amend

Schuman did not ask the trial court for further leave to amend, nor does he make that request on appeal. We therefore

---

reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." (*Laks v. Coast Fed. Sav. & Loan Assn.*, *supra*, 60 Cal.App.3d at p. 890.)

21

find no abuse of discretion in the trial court sustaining the demurrer without further leave to amend.

## DISPOSITION

The judgment is affirmed.  Citibank and Tyre-Karp are awarded their costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:


ROTHSCHILD, P. J.


M. KIM, J.